IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

CASE NO. 12-3592

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JOHNNY SUGGS,
Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Ohio
Eastern Division

BRIEF OF PLAINTIFF-APPELLEE

James D. Ingalls
20th Floor The Standard Building
1370 Ontario Street
Cleveland, Ohio 44113
Telephone No. (216) 363-6030
Facsimile No. (216) 363-6054
E-mail: jdilaw@gmail.com

Counsel for Defendant-Appellant

STEVEN M. DETTELBACH
United States Attorney

Daniel R. Ranke
Assistant U.S. Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Telephone No: (216) 622-3753
Facsimile No: (216) 522-7358
E-mail: daniel.ranke@usdoj.gov

Counsel for Plaintiff-Appellee

ii

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION.. . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.    THE GOVERNMENT PRESENTED SUFFICIENT EVIDENCE TO
      ESTABLISH THE ELEMENTS OF FORGING ENDORSEMENTS ON
      TREASURY CHECKS, IN VIOLATION OF 18 U.S.C. § 510(a)(2), AS
      CHARGED IN COUNT SEVEN OF THE INDICTMENT. . . . . . . . . . . . 22

II.   THE DISTRICT COURT PROPERLY ADMITTED THE TESTIMONY
      OF ELIZABETH CRESPO AS WELL AS GOVERNMENT'S EXHIBIT
      18.  CRESPO'S TESTIMONY WAS NOT HEARSAY AND THERE WAS
      NO CONFRONTATION CLAUSE VIOLATION.. . . . . . . . . . . . . . . . . . 30

III.  SUGGS' RIGHT TO A JURY DRAWN FROM A FAIR CROSS-SECTION
      OF THE COMMUNITY WAS NOT VIOLATED.. . . . . . . . . . . . . . . . . 38

IV.   THE DISTRICT COURT PROPERLY DENIED SUGGS' MOTION TO
      REEVALUATE HIS COMPETENCY BEFORE TRIAL. . . . . . . . . . . . . 41

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

iii

CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION.. . . . . . . . 50

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS. . . . . . . 52

iv

## <u>TABLE OF AUTHORITIES</u>

<u>FEDERAL CASES</u>                                              <u>PAGE(S)</u>

*Berghuis v. Smith*, 130 S. Ct. 1382 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Bobb v. Att'y Gen.*, 458 F.3d 213 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Crawford v. Washington*, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Davis v. Washington*, 547 U.S. 813 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Drope v. Missouri*, 420 U.S. 162 (1975).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

*Duren v. Missouri*, 439 U.S. 357 (1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Ford v. Seabold*, 841 F.2d 677 (6th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jackson v. Virginia*, 443 U.S. 307 (1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 23

*Owens v. Sowders*, 661 F.2d 584 (6th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Trepel v. Roadway Express, Inc.*, 194 F.3d 708 (6th Cir. 1999). . . . . . . . . . . . . . 30

*United States v. Abboud*, 438 F.3d 554 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . 23

*United States v. Alatrash*, 460 Fed. Appx. 487 (6th Cir. 2012). . . . . . . . . . . . . . . 22

*United States v. Allen*, 160 F.3d 1096 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . 38, 40

*United States v. Bartholomew*, 310 F.3d 912 (6th Cir. 2002). . . . . . . . . . . . . . . . 30

*United States v. Boyd*, 640 F.3d 657 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Brown*, 53 F.3d 312 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . 26, 27

v

*United States v. Carnes*, 309 F.3d 950 (6th Cir. 2002).. . . . . . . . . . . . . . . . . 19, 22

*United States v. Chance*, 306 F.3d 356 (6th Cir. 2002). . . . . . . . . . . . . . . . . 19, 22

*United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004). . . . . . . . . . . . . . . . . . 35

*United States v. Davis*, 93 F.3d 1286 (6th Cir. 1996).. . . . . . . . . . . . . . . . . . . . 42

*United States v. Ellisor*, 522 F.3d 1255 (11th Cir. 2008). . . . . . . . . . . . . . . . 26, 27

*United States v. Gibbs*, 506 F.3d 479 (6th Cir. 2007).. . . . . . . . . . . . . . . . . . . 32

*United States v. Graham*, 622 F.3d 445 (6th Cir. 2010).. . . . . . . . . . . . . . . . 18, 23

*United States v. Haywood*, 280 F.3d 715 (6th Cir. 2002).. . . . . . . . . . . . . . . . 30

*United States v. Henderson*, 626 F.3d 326 (6th Cir. 2010). . . . . . . . . . . . . . . . . 30

*United States v. Jackson*, 179 Fed. Appx. 921 (6th Cir. 2006). . . . . . . . . . . . . 42

*United States v. Johnson*, 581 F.3d 320 (6th Cir. 2009).. . . . . . . . . . . . . . . . . . 35

*United States v. Jones*, 495 F.3d 274 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . 41

*United States v. Kuehne*, 547 F.3d 667 (6th Cir. 2008). . . . . . . . . . . . . . . . 19, 22

*United States v. McAuliffe*, 490 F.3d 526 (6th Cir. 2007). . . . . . . . . . . . . . . . 23

*United States v. McCarty,* 628 F.3d 284 (6th Cir. 2010). . . . . . . . . . . . . . . . . 41

*United States v. Miller*, 531 F.3d 340 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . 42

*United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985). . . . . . . . . . . . . . . . . 38

*United States v. Noel*, 938 F.2d 685 (6th Cir. 1991).. . . . . . . . . . . . . . . . . . . . 30

*United States v. Odeneal*, 517 F.3d 406 (6th Cir. 2008).. . . . . . . . . . . . . . . . 40

vi

*United States v. Perry*, 438 F.3d 642 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Robinson*, 389 F.3d 582 (6th Cir. 2004). . . . . . . . . . . . . . . . . . . 31

*United States v. Ross*, ___ F.3d ___ , 2012 WL 6734087 (6th Cir. 2012). . . . . . . . 41

*United States v. Salgado*, 250 F.3d 438 (6th Cir. 2001). . . . . . . . . . . . . . . . . . . . 23

*United States v. Schreane*, 331 F.3d 548 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . 31

*United States v. Smith*, 463 Fed. Appx. 564 (6th Cir. 2012). . . . . . . . . . . . . . . . 39

*United States v. Tucker*, 204 Fed. Appx. 518 (6th Cir. 2006). . . . . . . . . . . . . . . . 42

*United States v. Wesley*, 417 F.3d 612 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . 22

*United States v. Williams*, 390 F.3d 1319 (11th Cir. 2004). . . . . . . . . . . . . . . . . 26

*United States v. Willis*, 362 Fed. Appx. 531 (6th Cir. 2010). . . . . . . . . . . . . . 41, 48

*United States v. Wright*, 343 F.3d 849 (6th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 30

*Whorton v. Bockting*, 549 U.S. 406 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Williams v. Bordenkircher*, 696 F.2d 464 (6th Cir. 1983). . . . . . . . . . . . . . . . 42, 43

*Wolcott v. United States*, 407 F.2d 1149 (10th Cir. 1969). . . . . . . . . . . . . . . . . . 48

## **FEDERAL STATUTES**

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 510(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 18, 22-24, 28, 36

18 U.S.C. § 513(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

vii

18 U.S.C. § 1014. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1344. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## **<u>FEDERAL RULES</u>**

Fed. R. App. P. 34(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  viii

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19

Fed. R. Evid. 801(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 32

viii

## **STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-appellee, the United States of America, believes that the facts and legal arguments are adequately addressed in the briefs and that the resolution of this case would not be assisted by oral argument.  Accordingly, the government requests that the Court decide this case on the briefs, without oral argument, under Fed. R. App. P. 34(f).

## <u>STATEMENT OF SUBJECT MATTER AND APPELLATE<br>JURISDICTION</u>

The district court derived jurisdiction under 18 U.S.C. § 3231.  The court entered a final judgment against the appellant, Johnny Suggs, on May 8, 2012.  (R. 116: Judgment, PageID 1045).  Suggs filed a timely notice of appeal on May 15, 2012.  (R. 118: Notice of Appeal, PageID 1055).  This Court derives jurisdiction under 28 U.S.C. § 1291.

2

## <u>STATEMENT OF THE ISSUES</u>

I.     Whether Suggs' conviction for forging endorsements on treasury checks, in violation of 18 U.S.C. § 510(a)(2), as charged in count seven of the indictment, was supported by sufficient evidence?

II.    Whether the district court properly admitted the testimony of Elizabeth Crespo, and Government's Exhibit 18, which demonstrated that Suggs had fraudulently endorsed social security checks belonging to another and whether the admission of that testimony and evidence violated the Confrontation Clause?

III.   Whether Suggs' Sixth Amendment right to a jury drawn from a fair cross-section of the community was violated?

IV.    Whether the district court properly denied Suggs' motion to reevaluate his competency before trial?

3

## STATEMENT OF THE CASE

On May 20, 2009, Johnny Suggs was charged in an eight-count indictment with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (count one), submitting a fraudulent loan application, in violation of 18 U.S.C. §§ 1014 and 2 (count two), bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (counts three, four and six), fraud relating to a loan application, in violation of 18 U.S.C. §§ 1341 and 2 (count five), forging endorsements of treasury checks, in violation of 18 U.S.C. § 510(a)(2) (count seven), and possession of forged securities, in violation of 18 U.S.C. §§ 513(a) and 2 (count eight).  (R. 1: Indictment, PageID 1-12).  On January 11, 2012, the government moved to dismiss counts four and six of the indictment.  (R. 73: Government's Motion to Dismiss, PageID 351).  Subsequently, the government orally moved to dismiss count eight of the indictment and to strike check number 4024 96438008 from count seven.  (R. 92: Sealed Competency Hearing Transcript, 1/17/12, PageID 586).  The district court granted both motions.  (*Id*.).

Suggs filed a motion *in limine* before trial seeking to prohibit the government from introducing evidence about social security checks upon which he had forged endorsements and cashed.  (R. 79: Suggs' Motion *in Limine*, PageID

4

464).  The district court denied Suggs' motion.  (R. 131: Trial Transcript, 1/18/12,

PageID 1281).

On January 12, 2012, Suggs' counsel also filed a motion to have Suggs'

competency reevaluated.  (R. 74: Motion, PageID 357).  In addition, Suggs

requested a trial continuance even though trial was scheduled to begin in five

days, on January 16, 2012.  (R. 75: Motion to Continue, PageID 359).  The district

court held a hearing on January 17, 2012.  The court denied Suggs' motions,

finding that he did not need to be reevaluated since two prior competency

evaluations conducted by two different doctors determined that he was indeed

competent.  The court concluded further that a trial continuance was unnecessary.

(R. 92: Sealed Competency Hearing Transcript, 11/17/12, PageID 581).  The court

issued a written memorandum opinion and order the following day.  (R. 80:

Memorandum Opinion and Order, PageID 468).

A jury trial began on January 18, 2012.  On January 20, 2012, Suggs was

found guilty of all the remaining counts in the indictment.  (R. 81: Verdict, PageID

471-73).  On May 7, 2012, the district court sentenced Suggs to a 60-month term

of incarceration on all counts, to be served concurrently, followed by a three-year

term of supervised release, a $500 special assessment and $869,731 restitution,

due joint and several with Suggs' co-defendants.  The district court entered its

5

judgment the next day.  (R. 116: Judgment, PageID 1045).  Suggs filed a timely

notice of appeal on May 15, 2012.  (R. 118: Notice of Appeal, PageID 1055).

6

## STATEMENT OF THE FACTS

This case arose from a conspiracy to defraud federally insured financial institutions through the submission of false loan applications containing fraudulent financial and employment information designed to secure approval to purchase a number of properties in the Cleveland, Ohio, area, which was orchestrated by Johnny Suggs and in which Doris Strickland and others participated.  Suggs also forged endorsements on a number of social security checks of Aida Corona-Cruz and deposited those checks in his own accounts.

Doris Strickland, a 63-year-old former employee of the U. S. Postal Service, testified that she had known Suggs since she was a teenager.  (R. 131: Trial Transcript, 1/18/12, Strickland, PageID 1348).  Strickland saw Suggs while shopping at Value City in Euclid, Ohio, in 1998, and they discussed a house Suggs had just purchased on Lee Road in Shaker Heights, Ohio.  (*Id*., PageID 1349). Suggs eventually moved into Strickland's basement in 2000, after Strickland had filed for divorce in 1999.  (*Id*., PageID 1350).

Strickland and Suggs then concocted a scheme where she would buy the Lee Road property from Suggs and split the proceeds.  Strickland needed the money to pay for her contested divorce proceeding.  (*Id*.).  In furtherance of the scheme, Suggs prepared a loan application for Strickland containing false financial

7

information about Strickland's monthly salary and employment.  Specifically,

Suggs claimed that Strickland worked for the James & Albert Group, a sham

company operated by Suggs, and that she made a monthly income that was

significantly more than she actually earned.  Strickland never worked for the

James & Albert Group.  (*Id*., PageID 1351).

By way of background, the Director of the Shaker Heights Housing

Inspection Department, Bill Hansen, testified that the Lee Road property was a

historic residence built in 1918 by Mead and Hamilton, a renowned architectural

firm of the era.  It was an 8,400 square foot structure with 18 rooms, 9 bedrooms,

five baths, four wood burning fireplaces and consisted of two separate mansions

connected by a common wall.  (*Id*., Hansen, PageId 1338).  The Lee Road property

had 54 housing code violations when Suggs purchased it in 1998, for $485,000.

Suggs assumed the violations.  In 2000, a reinspection completed in anticipation

of Suggs' sale of the house to Strickland revealed 154 code violations.  (*Id*.,

PageID 1332-34).  Suggs sold the property for $1,300,000 in 2000.  (*Id*., PageID

1336).  The last time Hansen inspected the property in 2003, it had significantly

deteriorated with major water damage and was in foreclosure.  (*Id*., PageID 1337).

The resulting sale of the Lee Road property from Suggs to Strickland netted

Suggs $162,000, which he then split with Strickland under their prior agreement.

8

(*Id*., Strickland, PageID 1355).  Initially, some of the proceeds of the sale were used to pay the mortgage on the Lee Road property.  (*Id*.).

After a time, Suggs and Strickland decided to obtain a home equity loan on the Lee Road property for $195,000.  (*Id*., PageID 1357).  Once again, Suggs prepared fraudulent loan documentation using the James & Albert Group as the fictitious source of Strickland's employment and income.  (*Id*.).  Suggs fraudulently claimed that Strickland's monthly gross income as a James & Albert Group employee was $24,496.16, and that she had worked for the company for 11 years.  (*Id*., PageID 1358).  Strickland actually was working for the post office at this time making substantially less money that Suggs represented.  She knew the information Suggs was submitting to the bank was false but she agreed because Suggs told her it was necessary.  (*Id*., PageID 1359).  After the home equity loan was approved, based on the fraudulent information Suggs provided, Strickland paid some bills and they split the remaining proceeds, $144,215.50.  (*Id*., PageID 1360-62).

Suggs continued to live in Strickland's basement through September, 2001. He did not work during that time.  (*Id*., PageID 1363).  Ultimately, Suggs stopped paying Strickland money for the mortgage on the Lee Road property.  Strickland

9

filed for bankruptcy and the Lee Road property entered foreclosure. (*Id*., PageID 1364).

Strickland testified further that, in late 2000, or early 2001, she participated with Suggs in the fraudulent sale and purchase of another residential property located on Rushliegh Road in Cleveland Heights, Ohio. Strickland purchased the house for $68,000 in December, 2000, and sold it to Candice Simpson, the 19 year-old daughter of Strickland's friend Jessica Harris, in November, 2001, for $122,000. (*Id*., PageID 1367).

Once again, Suggs prepared a fraudulent loan application, this time on behalf of the buyer, Candice Simpson, which listed her as an employee of the James & Albert Group making $3,380 per month. In reality, Simpson, who was a college student at the time, never worked for the James & Albert Group and had little involvement with the sale other than signing the paperwork Suggs prepared. (*Id*., Simpson, PageID 1422-23). Strickland testified that the proceeds of the sale, $41,623, were then divided between herself, Suggs and Jessica Harris. Specifically, she and Suggs received $12,311.95, and Harris received $17,000. (*Id*., Strickland, PageID 1371). Ultimately, the property went into foreclosure after Suggs, who had received rent money from tenants on Simpson's behalf, kept the money and did not make the mortgage payment as had been agreed by the

10

parties. (*Id*., Harris, PageID1447). Harris subsequently filed a report with the Cleveland Heights Police. (*Id*., PageID 1442).

In September, 2001, Strickland requested that Suggs move from her basement. (*Id*., Strickland, PageID 1373). She petitioned the State of Ohio to remove her name as an agent of the James & Albert Group on January 27, 2005. (*Id*., PageID 1374). Strickland retired from the Postal Serice, where she never made more that $55,000 a year, in 2006. (*Id*., PageID 1368). When she was approached by the Secret Service in 2008, she agreed to cooperate and ultimately pleaded guilty to bank fraud in 2010. (*Id*., PageID 1377-78).

Ermiti Vestri, former chief operating officer and chief credit officer for Finance America, testified that Suggs submitted a loan application for a house on University Road in Cleveland, Ohio, in September, 2005. The purchase price for the property was $300,800. Vestri testified that the loan for the University Road property would not have been approved if the bank had known the information provided by Suggs on the application was false. (R. 132: Trial Transcript, 1/19/12, Vestri, PageID 1581).

Carlos Crespo testified that he worked as an independent cable/phone jack installer and had installed phone jacks at Suggs' Lee Road property in 2003. (R. 131: Trial Transcript, 1/18/12, C. Crespo, PageID 1448). Despite the fact that

11

Crespo made approximately $10,000 a year installing phone jacks, Suggs offered

to assist him purchasing a home. (*Id*., PageId 1450). Suggs told Crespo to borrow

$2,200 from friends and family to give the appearance that Crespo had money in

his account. Crespo did as Suggs instructed. (*Id*., PageID 1451). Suggs then

completed a false loan application for Crespo, as well as fraudulent tax forms, pay

stubs and child support documentation. (*Id*., PageID 1457). With Suggs'

assistance, Crespo purchased a house on West 58th Street in Cleveland, Ohio.

After Crespo purchased the property, Suggs moved into the house where he

lived rent free for a time. (*Id*., PageID 1458). While Suggs was at the house,

Crespo's grandmother, Aida Corona-Cruz, had returned to Puerto Rico for family

reasons. While she was gone, Crespo had cashed a number of her social security

checks which had been mailed to the residence. Suggs, who was monitoring the

mail while living at the house, gave Crespo the checks when they were delivered.

(*Id*., PageID 1464). After Suggs gave Crespo the first two checks, Crespo did not

receive any more. (*Id*., PageID 1464-65).

Elizabeth Crespo, Carlos Crespo's sister, testified that she had cared for her

grandmother, Aida Corona-Cruz due to Cruz' deteriorating health and memory

loss. (*Id*., E, Crespo, PageID 1482). She testified that she was very familiar with

her grandmother's signature. (*Id*., PageID 1483). After her grandmother returned

12

from Puerto Rico, where she had been for six months in 2004 due to her son's death, they realized that Corona-Cruz had not received her social security checks. (*Id*., PageID 1485).  They asked Social Security to investigate.  (*Id*., PageID 1487). The investigation revealed that six to eight checks had been cashed improperly. (*Id*., PageID 1490).  Specifically, the signatures on the checks were not her grandmother's.  (*Id*., PageId 1493).  Crespo knew Suggs through her brother Carlos, but could think of no reason why Suggs would have possessed her grandmother's social security checks.  (*Id*., 1494).   Crespo's grandmother died in 2009.  (*Id*., PageID 1495).

Yvette Feliciano, assistant district manager for the Cleveland Office of the Social Security Administration, testified that she conducted an investigation into the misappropriation of Aida Corona-Cruz' social security checks.  (R. 132: Trial Transcript, Feliciano, PageID 1557).  Feliciano testified that Corona-Cruz signed a claim form (government's exhibit 18) in which she swore that she had not cashed any social security checks from September 2004, through January, 2005. Feliciano then identified the checks which social security had mailed to Corona-Cruz, but which she had not cashed.  (*Id*., PageID 1557-59).

Jennifer Mattingly, loss prevention manager for PNC Bank, testified that she had been asked to review and provide records for the Vandever Revocable

13

Trust, for which Suggs was listed as trustee.  (R. 131: Trial Transcript, Mattingly, PageID 1521).  She noted that there was one particular deposit of $705 into the trust which consisted of two U. S. Treasury checks made payable to Aida Corona-Cruz, one in the amount of $564 and one in the amount of $141.  That deposit represented the most money ever placed into that account.  (*Id*., PageID 1526).

Similarly, Nora Koepf, an investigator for Charter One Bank, testified that she reviewed the account for the James & Albert Group.  (*Id*., Koepf, PageID 1534).  Suggs deposited three U.S. Treasury checks made payable to Aida Corona-Cruz into the James & Albert checking account totaling $1,707.  (*Id*., PageID 1536).  Suggs deposited these checks on November 9, 2004, December 7, 2004 and December 31, 2004.  (*Id*.).

Former Secret Service Agent Jeffrey Maslar testified that he investigated the fraudulent cashing of Aida Corona-Cruz' social security checks.  (*Id*., Maslar, PageID 1658).  Maslar was initially given three checks.  Two were cashed by Carlos Crespo at Gas, U.S.A.  (*Id*., PageID 1658).  The third check was cashed at National City Bank, now PNC Bank, using Vandever Revocable Living Trust, an account belonging to Suggs.  (*Id*.).

Further investigation revealed that Suggs owned four properties, all of which were in foreclosure.  (*Id*., PageID 1659).  Maslar then reviewed the loan

14

application information for Suggs' properties and noted that the information

provided was inconsistent with what he had been told by Suggs.  A subsequent

search of Suggs' University Road property revealed an array of financial

documentation, including trust accounts, food stamp applications, other

individuals' drivers' licenses and rent forms.  (*Id*., PageID 1661).  Many of the

documents discovered contained false information about Suggs' financial

wherewithal and employment status and history which he used to purchase and

attempt to purchase various properties in the Cleveland, Ohio, area.  (*Id*., PageID

1666-74).  Maslar learned that Suggs had never made a payment on the University

Road property.  (*Id*., PageID 1665).

Maslar also found Charter One Bank records documenting that Suggs had

cashed three of Aida Corona-Cruz' social security checks through his James &

Albert Group checking account.  (*Id*., PageID 1694).  Suggs admitted to Maslar

that he had forged Corona-Cruz' name on the social security check which had

been cashed at National City Bank.  (*Id*., PageID 1702).  Maslar was unable to find

any evidence that Suggs ever worked for the James & Albert Group or that he was

in any way authorized to cash Corona-Cruz' social security checks.  (*Id*., PageID

1713).

15

Secret Service Agent Eric Balish testified that he analyzed Suggs' computer and floppy disks in connection with his investigation.  (*Id*., Balish, PageID 1601).  Many of the fraudulent documents Suggs had submitted throughout the conspiracy were found on his computer or on the disks.  (*Id*., PageID 1610-21).

After the government rested its case, Suggs made a general motion for judgment of acquittal under Crim. R. 29.  (R. 133: Trial Transcript, 1/20/12, PageID 1767).  The district court denied the motion.  (*Id*.).

Suggs testified on his own behalf.  (*Id*., Suggs, PageID 1767).  He maintained that he had taken a number of number of real estate courses about how to purchase property with no money down.  (*Id*., PageID 1769).  He then began buying and selling real estate for investment purposes.  (*Id*., PageID 1772).

Suggs testified that he purchased the Lee Road property with the idea of making it a bed and breakfast.  (*Id*., PageID 1778).  The City of Shaker Heights refused his request for a variance and he then sold the property to Strickland.  Suggs denied completing Strickland's loan application.  (*Id*., PageID 1779).  Suggs also denied assisting Strickland with the home equity loan on the Lee Road property.  (*Id*., PageID 1782).

Suggs testified further that his only involvement with the Rushliegh Road property was as an investment.  Suggs denied completing the loan application on

16

that property as well.  (*Id*., PageID 1797).  Similarly, Suggs denied providing any

fraudulent information for his purchase of the University Road house, claiming

that the income he listed on the loan application was projected income only,

despite the fact that he created W-2 tax forms listing the income amount as actual

income.  (*Id*., PageID 1804-05).

Suggs also denied providing fraudulent information for Carlos Crespo's

loan application and that he ever lived in the same home as Crespo.  (*Id*., PageID

1785).  Suggs further denied forging Aida Corona-Cruz's name on any of the

social security checks he cashed.  Rather, he claimed he cashed the checks for

Carlos Crespo and that he never received any of the proceeds.  (*Id*., PageID 1794).

After Suggs rested his case, he did not renew his Crim. R. 29 motion for

judgment of acquittal.  The jury found Suggs guilty of counts one, two, three, five

and seven of the indictment.  (*Id*., PageID 1918; R. 81: Jury Verdict, PageID 471-

73).

On May 7, 2012, the district court sentenced Suggs to a 60-month term of

incarceration on all counts, to be served concurrently, followed by a three-year

term of supervised release, a $500 special assessment and $869,731 restitution,

due joint and several with Suggs' co-defendants.  The district court entered its

17

judgment the next day.  (R. 116: Judgment, PageID 1045).  Suggs filed a timely

notice of appeal on May 15, 2012.  (R. 118: Notice of Appeal, PageID 1055).

18

## SUMMARY OF THE ARGUMENT

Suggs' conviction for forging endorsements of treasury checks, in violation of 18 U.S.C. § 510(a)(2) was supported by sufficient evidence.  Specifically, the government presented sufficient evidence that Suggs had access to the mail at the residence where Aida Corona-Cruz received her social security checks.  Suggs also knew that Carlos Crespo, Corona-Cruz' grandson, was receiving the checks at that residence.  In fact, Suggs had delivered two of the checks to Crespo before the checks began disappearing.  Subsequently, the government demonstrated that Suggs had cashed the checks, which totaled $2,412, through two of his accounts, one at PNC Bank and the other at Charter One Bank.  Suggs admitted to Masler that he had forged the endorsement on one check.  Moreover, Elizabeth Crespo, Corona-Cruz' granddaughter, testified from personal knowledge that the signatures on the checks were not that of Corona-Cruz.  Viewing this evidence in a light most favorable to the government, as this Court is required to do under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010), the government presented sufficient evidence to support Suggs' conviction.

19

In addition, since Suggs did not renew his motion for judgment of acquittal at the close of all the evidence under Rule 29 of the Federal Rules of Criminal Procedure, his failure constitutes a waiver of sufficiency objections. *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (citing *United States v. Chance*, 306 F.3d 356, 368-69 (6th Cir. 2002)). Thus, his sufficiency challenge may only be reviewed under the "manifest miscarriage of justice" standard. *Kuehne*, 547 F.3d at 697 (citing *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)). Under that standard, this Court may "only reverse a conviction if the record is *devoid* of evidence pointing to guilt." *Kuehne*, 547 F.3d at 697 (emphasis supplied); *Carnes*, 309 F.3d at 956. That is simply not the case here.

The district court properly admitted the testimony of Elizabeth Crespo about the investigation into the theft of her deceased grandmothers's social security checks. Crespo's testimony, including the statement that the endorsements on the social security checks were mot her grandmother's, was not based upon what she was told by another. Rather, it was based upon her own personal knowledge of the theft of the social security checks and the subsequent investigation in which she was personally  involved. Crespo's testimony was not hearsay and was properly admitted.

20

Moreover, the admission of Crespo's testimony and the claim form signed by her grandmother in Crespo's presence did not violate Suggs' Sixth Amendment rights under the Confrontation Clause.  Crespo testified from her personal knowledge, was under oath and was available for cross-examination.  Exhibit 18 was not testimonial in nature.  Suggs' Confrontation Clause rights were not implicated.  Even if this Court disagrees and concludes that Exhibit 18 should not have been admitted, any error was harmless as the other evidence concerning Count 7, including Suggs' deposits of the social security checks into his accounts and his admission to Masler, was very strong.  In addition, Exhibit 18 was pertinent only to Count 7 and could not have affected the verdicts on Counts 1, 2, 3 and 5.

Suggs also was not denied his Sixth Amendment right to be tried by a jury drawn from a fair cross-section of the community.  Suggs' contention to the contrary, African-Americans were not "systematically" underrepresented in the pool of potential jurors.  A defendant is not entitled to a venire of any particular percentage of persons of a given race, provided that there is no "systematic" exclusion.  Suggs is not entitled to relief on this claim.

Finally, the district court properly concluded that Suggs was not entitled to another competency evaluation before trial.  Specifically, the court's finding that

21

he did not need to be reevaluated based on two prior competency evaluations conducted by two different doctors, both of whom determined that Suggs was indeed competent, was not an abuse of discretion.

Suggs' conviction and sentence should be affirmed.

22

## ARGUMENT

I.    **THE GOVERNMENT PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH THE ELEMENTS OF FORGING ENDORSEMENTS ON TREASURY CHECKS, IN VIOLATION OF 18 U.S.C. § 510(a)(2), AS CHARGED IN COUNT SEVEN OF THE INDICTMENT.**

A.    **Standard of Review**

With respect to the sufficiency of the evidence for 18 U.S.C. § 510(a)(2), Suggs moved for a general judgment of acquittal at the close of the government's case. (R. 133: Trial Transcript, 1/20/12, PageID 1767). However, Suggs did not renew his motion for judgment of acquittal at the conclusion of his own case. Therefore, Suggs' sufficiency challenge is waived. *United States v. Wesley*, 417 F.3d 612, 617 (6th Cir. 2005); *United States v. Alatrash*, 460 Fed. Appx. 487, 491 (6th Cir. 2012); *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008) (citing *United States v. Chance*, 306 F.3d 356, 368-69 (6th Cir. 2002)). Thus, his sufficiency challenge may only be reviewed under the "manifest miscarriage of justice" standard. *Kuehne*, 547 F.3d at 697 (citing *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)). Under that standard, this Court may "only reverse a conviction if the record is *devoid* of evidence pointing to guilt." *Kuehne*, 547 F.3d at 697 (emphasis supplied); *Carnes*, 309 F.3d at 956.

23

Even if this Court were to apply the normal sufficiency of the evidence standard, Suggs "bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006). The normal standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Graham*, 622 F.3d at 448. Since the government prevailed below, it must be given the benefit of all reasonable inferences from the testimony. *Graham*, 622 F.3d at 448; *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007). This Court may not re-weigh the evidence, re-consider the credibility of witnesses or substitute its judgment for that of the fact-finder below. *Graham*, 622 F.3d at 448. All credibility issues, on appeal, must be resolved in favor of the verdict. *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001).

**B.    Discussion**

Suggs maintains that the government failed to present sufficient evidence to support his conviction under 18 U.S.C. § 510(a)(2). Specifically, he argues that: (1) the government did not establish that the endorsements on the five social security checks he deposited into his accounts were forged; (2) the government did not establish that Suggs knew the endorsements were forged; (3) Suggs did not intend to defraud the government because he believed he had Carlos Crespo's

24

permission to deposit the checks; (4) the government did not establish that the aggregate value of the checks exceeded $1,000; and (5) the government referenced a forged social security check outside of the time frame specified in the indictment.  A review of the record fails to support Suggs' assertions.

To obtain a conviction under § 510(a)(2), the government must prove the following elements beyond a reasonable doubt: "(1) that the defendant passed or attempted to pass a United States Treasury Check; (2) that the check bore a forged or falsely made endorsement; (3) that the defendant passed the check with intent to defraud; and (4) that the defendant acted knowingly and willfully."  *Bobb v. Att'y Gen*., 458 F.3d 213, 227 (3d Cir. 2006).

Suggs' contention to the contrary, the government presented sufficient evidence that the endorsements on the five checks he deposited into his two accounts were forged.  Elizabeth Crespo, Aida Corona-Cruz' granddaughter, testified that, when her grandmother returned from Puerto Rico, they both realized that Corona-Cruz' social security checks were missing.  (R. 131: Trial Transcript, 1/18/12, E. Crespo, PageID 1485).  A subsequent investigation by the Social Security Administration, which was initiated at their request, revealed that six to eight of Corona-Cruz' social security checks had been fraudulently endorsed and cashed.  (*Id*., PageID 1487-90).  Specifically, Crespo testified from personal

25

knowledge that the endorsements on the checks were not those of Corona-Cruz. (*Id.*, PageID 1493). Crespo also testified that she was very familiar with her grandmother's signature and that the signatures on the missing checks were not hers. (*Id.*, PageID 1483, 1493). This testimony alone sufficed to prove that the endorsements were forged. In addition, Suggs admitted to Maslar that he forged one of the endorsements. (R. 131: Trial Transcript, 1/18/12, Maslar, PageID 1702).

Yvette Feliciano, assistant district manager for the Cleveland Office of the Social Security Administration, testified that she investigated the misappropriation of Corona-Cruz' social security checks. (R. 132: Trial Transcript, 1/19/12, Feliciano, PageID 1557). As part of her investigation, she noted that Corona-Cruz had signed a claim form in which she swore that she had not cashed or endorsed the missing social security checks. Elizabeth Crespo was with her when she signed the form. (*Id.*, PageID 1557-59). When viewing the evidence presented in a light most favorable to the prosecution, the government presented sufficient evidence that the endorsements on the stolen checks were forged.

Suggs' contention that the government failed to present sufficient evidence that he knew the endorsements on the social security checks were forged and that he did not intend to defraud the government because he believed he had Crespo's

26

permission is equally unfounded.  Suggs testified at trial that he deposited Corona-

Cruz' social security checks into his accounts at the request of Carlos Crespo and

did not retain any of the proceeds.  (R. 133: Trial Transcript, 1/20/12, Suggs,

PageID 1794).  However, Suggs' testimony was directly contradicted by Carlos

Crespo, who testified that he did not give Suggs permission to deposit his

grandmother's checks.  In fact, Crespo stated that he could not think of any reason

why Suggs would have his grandmother's checks.  (R. 131: Trial Transcript,

1/18/12, C. Crespo, PageID 1463).  Elizabeth Crespo also testified that there was

no reason for Suggs, who she had met through her brother Carlos, would ever have

her grandmother's social security checks.  (*Id*., E. Crespo, PageID 1494).

When a criminal defendant testifies at trial, the jury is entitled to reject that

testimony and to consider it as substantive evidence of his guilt. *United States v.*

*Brown*, 53 F.3d 312, 314 (11th Cir. 1995).  "Where some corroborative evidence

of guilt exists for the charged offense and the defendant takes the stand in his own

defense, the defendant's testimony, denying guilt, may establish, by itself,

elements of the offense."  *United States v. Ellisor*, 522 F.3d 1255, 1272 (11th Cir.

2008); *see also United States v. Williams*, 390 F.3d 1319, 1325 (11th Cir. 2004)

("Defendants in criminal trials are not obliged to testify. And a defendant who

chooses to present a defense runs a substantial risk of bolstering the Government's

27

case." (quotation marks omitted)).  "This rule applies with special force where the elements to be proved for a conviction include highly subjective elements" such as intent or knowledge.  *Brown*, 53 F.3d at 315; *Ellisor*, 522 F.3d at 1272.  Here, Suggs' trial testimony directly contradicted the testimony of virtually every witness against him.  The jury was free to disbelieve Suggs' conflicting testimony and to construe it as substantive evidence of his knowledge and intent to defraud the government.  The evidence was sufficient to support Suggs' conviction on Count 7.

Suggs' contention that the government failed to establish that the aggregate value of the social security checks he stole exceeded $1,000 is also unsupported by the record.  Jennifer Mattingly, loss prevention manager for PNC Bank, testified that she reviewed the account records for the Vandever Revocable Trust, which listed Suggs as the trustee.  (*Id*., Mattingly, PageID 1521).  Suggs deposited $705 into the trust consisting of two checks made payable to Aida Corona-Cruz, one for $564 and one for $141.  (*Id*., PageID 1526).

Similarly, Nora Koepf, an investigator for Charter One Bank, testified that she reviewed the account for the James & Albert Group, one of Suggs' "business" accounts.  (*Id*., Koepf, PageID 1534).  Suggs deposited three U.S. Treasury checks

28

made payable to Aida Corona-Cruz totaling $1,707 into that account during a three month period.  (*Id*., PageID 1536).

Once more, viewing the evidence presented in a light most favorable to the government, it is readily apparent that sufficient evidence was admitted to establish that the aggregate value of the checks involved far exceeded $1,000.  In fact, the total aggregate value of the Corona-Cruz' social security checks Suggs' deposited into his own accounts was $2,412.  Clearly, this element was supported by sufficient evidence and no manifest miscarriage of justice occurred.

Lastly, the fact that Elizabeth Crespo identified her grandmother's fraudulently endorsed social security check for February, 2005, does not somehow reduce the sufficiency of the evidence for the specific checks enumerated in count seven of Suggs' indictment.  Suggs was not convicted of a § 510(a)(2) violation based on the February, 2005, check.  Rather, he was convicted based upon the five checks listed in count seven of the indictment for which sufficient evidence was presented.  (R. 81: Jury Verdict, PageID 473).

Based upon the foregoing, Suggs is not entitled to relief on this claim.  The government presented sufficient evidence to establish the elements of § 510(a)(2). Rather than being devoid of evidence of Suggs' guilt, the record contains ample evidence that Suggs took Corona-Cruz' social security checks, fraudulently

29

endorsed each one and deposited them in his own accounts for his own personal use.  No manifest miscarriage of justice occurred.

**II.   THE DISTRICT COURT PROPERLY ADMITTED THE
TESTIMONY OF ELIZABETH CRESPO AS WELL AS
GOVERNMENT'S EXHIBIT 18.  CRESPO'S TESTIMONY WAS
NOT HEARSAY AND THERE WAS NO CONFRONTATION
CLAUSE VIOLATION.**

**A.    Standard of Review**

This Court's reviews a district court's admission or exclusion of evidence

for abuse of discretion.  *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir.

2010); *United States v. Perry*, 438 F.3d 642, 647 (6th Cir. 2006).  The same

standard is applied to the district court's evidentiary rulings involving hearsay.

*United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) (citing *Trepel v.

Roadway Express, Inc*., 194 F.3d 708, 716 (6th Cir. 1999)); *see also United States

v. Noel*, 938 F.2d 685, 688 (6th Cir. 1991) (applying abuse-of-discretion standard

of review to district court's ruling under hearsay exception for statements against

interest).  "Under this standard, we will leave rulings about admissibility of

evidence undisturbed unless we are 'left with the definite and firm conviction that

the [district] court ... committed a clear error of judgment in the conclusion it

reached upon a weighing of the relevant factors or where it improperly applies the

law or uses an erroneous legal standard.' "  *United States v. Bartholomew*, 310

F.3d 912, 920 (6th Cir. 2002) (alteration and omission in original) (quoting *United

States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)).

31

This Court reviews "all evidentiary rulings—including constitutional challenges to evidentiary rulings—under the abuse-of-discretion standard." *United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003). Potential violations of the Confrontation Clause are reviewed *de novo*. *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004).

**B.    Discussion**

Suggs' contention that Elizabeth Crespo's testimony constituted inadmissible hearsay and that the admission of government's exhibit 18, a social security claim form signed by Corona-Cruz and witnessed by Crespo, violated his rights under the Confrontation Clause is without merit. Suggs filed a motion *in limine* in which he first made this argument. (R. 79: Motion in Limine, PageID 464). The district court denied Suggs' motion, finding:

> Now, with respect to the missing Social Security checks, the defendant has also filed a motion *in limine* in that regard, it's document number 79, and defendant argues that there is going to be no testimony because the grandmother who filled out the claim form for the Social Security checks is now deceased.
>
> The government wants to offer testimony from the granddaughter who was present when the form was prepared and/or signed indicating the checks were missing. We're talking, by the way, for a time period of late 2004, early 2005, I believe. I will allow the granddaughter to testify if she has personal knowledge of what went on with respect to these Social Security checks. The defendant's argument that this is a violation of the confrontation clause as

32

interpreted by *Crawford versus Washington* is incorrect, I believe. Under the case law, I determine whether such -- Katie, he's trying to get in.

(Pause).

We took a pause so that a juror could get into the jury room.

Under the case law, I first ask is the action and conduct by the grandmother, and the comment to be offered by the granddaughter, testimonial; that is, was it anticipated to be offered in a criminal proceeding? I don't believe that it was. It's not testimonial, and therefore it's not a violation under *Crawford versus Washington*.

I'm relying in part on another case, a Sixth Circuit case, *U.S. versus Comer*, C-O-M-E-R, 389 F. 3d 662 at 675, a 2004 Sixth Circuit case.

Therefore, I'm denying the defendant's motion *in limine* as set forth in document number 79, and will play a bit by ear on the testimony that the granddaughter may be offering. I caution the government not to go too far.

Those are my rulings. Any questions, any comments before we call the jury in?

(R. 131: Trial Transcript, PageID 1279-81).

It is well established that hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007); Fed. R. Evid. 801(c). Suggs' contention to the contrary, a review of Elizabeth Crespo's testimony demonstrates that it was not inadmissible hearsay.

33

Crespo's testimony, including her statement that the endorsements on the checks were not her grandmother's, was not based on an out of court statement made by someone other than the declarant. Rather, Crespo's testimony was based upon her personal knowledge of the theft of Corona-Cruz' social security checks and her involvement with initiating the investigation with the Social Security Administration. Specifically, Crespo testified that she and Corona-Cruz realized that Corona-Cruz' social security checks were missing after Corona-Cruz returned from Puerto Rico. (*Id*., E. Crespo, PageID 1485). She then assisted her grandmother with initiating a social security complaint about the missing checks. (*Id*., PageID 1487). Crespo accompanied Corona-Cruz to Social Security on two separate occasions, where she acted as the interpreter for Corona-Cruz, who only spoke minimal English. (*Id*., PageID 1502). As interpreter, Crespo ensured that her grandmother understood the investigatory process. (*Id*., PageID 1501).

Crespo also testified that, since she had taken care of her grandmother for an extended period of time, she was very familiar with her grandmother's signature. (*Id*., PageID 1483). She then noted that the signatures on the social security checks were not her grandmother's since "She normally signs both last names because in Puerto Rico it's a custom to use the mother's and the father's last name."

34

(*Id.*, PageID 1491).  In addition, she stated that the signatures did not look like her grandmother's in any way.  (*Id.*).

Clearly, Crespo was not merely repeating what she had been told by her grandmother or the Social Security Administration, but testified from her own personal knowledge about her grandmother's signature, the missing checks and the resulting investigation.  Given that Crespo's testimony was based on her own personal knowledge, it did not constitute hearsay and the district's decision to allow it into evidence was correct.

Suggs' contention that his Sixth Amendment Confrontation Clause right was violated by the admission of Crespo's testimony as well as government exhibit 18, a social security claim form kept in the course of regularly conducted business activity which was signed by Corona-Cruz and witnessed by Crespo, is unavailing.  The Sixth Amendment's Confrontation Clause prohibits the introduction of testimonial statements and evidence against a witness absent calling that witness to the stand, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  By contrast, the Confrontation Clause has no bearing on out-of-court statements that are not testimonial.  *Whorton v. Bockting*, 549 U.S. 406, 420 (2007); *Davis v. Washington*, 547 U.S. 813, 825

35

(2006); *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009). While the Supreme Court in *Crawford* did not explicitly delineate what defines a "testimonial" statement, it held that the statement at issue --- a wife's recorded statement to police after her husband's arrest --- was testimonial in nature. *Crawford*, 541 U.S. 39-40, 68-69. However, in parsing the difference between testimonial and non-testimonial statements, the Court reasoned that at the core of testimonial statements are "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 51-52.

This Court has likewise held that, in deciding whether a statement is testimonial, the proper inquiry is whether the declarant "intends to bear testimony against the accused." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). The test is "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id*.

Here, the Confrontation Clause was simply not implicated. As the district court properly noted, the statements checked by Corona-Cruz on the social

36

security claim form, which were also witnessed by Crespo after she interpreted the form for her grandmother, were not testimonial in nature in that they were not offered in anticipation of a criminal proceeding against Suggs.  (R. 131: Trial Transcript, 1/18/12, PageID 1280).  Rather, they were general statements designed to ascertain whether Corona-Cruz had received and/or cashed the missing social security checks.  They were not made in anticipation of any future prosecution of Suggs.  In fact, when the claim form was completed, neither Corona-Cruz nor Crespo had any idea who had taken and cashed the missing social security checks. The claim form was not offered to prove that Suggs violated § 510(a)(2).  It was only offered to show that Corona-Cruz had not received or cashed the missing checks.

Moreover, Suggs was not prejudiced by his inability to cross-examine Corona-Cruz on whether she was entitled to receive social security payments when she was in Puerto Rico, as her eligibility was not relevant to the issue at hand, *i.e.*, whether Suggs had fraudulently taken and deposited the checks.  In addition, Suggs was able to develop this issue through his cross-examination of Yvette Feliciano, who acknowledged that Corona-Cruz was not eligible.  (R. 132: Trial Transcript, 1/19/12, Feliciano, PageID 1560).

37

The record shows that the Confrontation Clause was simply not violated. Crespo's  testimony, which was based on her personal knowledge, was not inadmissible hearsay.  In addition, government exhibit 18 was not testimonial in nature since it was not a statement made in anticipation of a criminal proceeding or offered to prove that Suggs had taken and deposited Corona-Cruz' social security checks.  *See generally United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011).

Even if this Court disagrees and concludes that Exhibit 18 should not have been admitted, any error was harmless as the other evidence concerning Count 7, including Suggs' deposits of the social security checks into his accounts and his admission to Maslar about forging one of the endorsements, was very strong. Further, Exhibit 18 was relevant only to Count 7 and would not have affected the verdicts on Counts 1, 2, 3 and 5.

38

## III.  SUGGS' RIGHT TO A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY WAS NOT VIOLATED.

### A.    Standard of Review

Whether a defendant has been denied his right to a jury selected from a fair cross-section of the community is a mixed question of law and fact, which this Court reviews *de novo*.  *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998) (citing *United States v. Miller*, 771 F.2d 1219, 1227 (9th Cir. 1985)).

### B.    Discussion

Suggs' contention that he was deprived of his Sixth Amendment right to a venire drawn from a fair cross-section of the community because African-Americans are systematically underrepresented in the pool of potential jurors who serve in the Northern District of Ohio is without merit.  The Supreme Court has held that "[t]he Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross-section of the community," *Berghuis v. Smith*, 130 S. Ct. 1382, 1387 (2010).  However, the Court has not held that a defendant is entitled to a jury venire of any particular racial composition.  The fact that there were only two African Americans jurors initially selected in this particular 46-member venire is Suggs' only factual basis for this claim.

39

*Duren v. Missouri*, 439 U.S. 357, 364 (1979), holds that a defendant

asserting a Sixth Amendment violation in the composition of the jury pool must

demonstrate that (1) the group alleged to be excluded is a distinctive group in the

community; (2) the representation of this group is not fair and reasonable; and (3)

the underrepresentation was due to a systematic exclusion of the group in the

selection process.  Here, Suggs has not met the standard set forth in *Duren* because

he presented no evidence of "systematic exclusion" of African-Americans from

jury venires in the Northern District of Ohio.  *Duren* described "systematic

exclusion" to mean exclusion "inherent in the particular jury-selection process

utilized."  *Duren*, 439 U.S. at 365–66.  The proof must be sufficient to support an

inference that a particular *process* results in systematic underrepresentation of a

distinctive group.  *United States v. Smith*, 463 Fed. Appx. 564, 570 (6th Cir.

2012).  No such inference is permissible if a federal jury venire reflects the

demographics of an entire multi-county federal district but not the demographics

of a particular county in which the crime is committed.

Suggs points to nothing in the Northern District of Ohio's selection process

that allows an inference that any underrepresentation was due to the system itself.

Merely because the percentage of a distinctive group selected in a single venire

does not mirror the percentage of the group in the entire community cannot be

40

construed as systematic exclusion. *See Allen*, 160 F.3d at 1103 (must show more

than that a particular panel was unrepresentative of the community); *Ford v.

Seabold*, 841 F.2d 677, 685 (6th Cir. 1988) (same).  The district court did not

abuse its discretion in overruling Suggs' objection to the jury selection process

because he provided no evidence of systematic exclusion of African-Americans

from jury venires in the Northern District of Ohio.  *United States v. Odeneal*, 517

F.3d 406, 411-12 (6th Cir. 2008).

Suggs is not entitled to relief from this claim.

41

## IV.  THE DISTRICT COURT PROPERLY DENIED SUGGS' MOTION TO REEVALUATE HIS COMPETENCY BEFORE TRIAL.

### A.    Standard of Review

This Court reviews the determination of whether there is reasonable cause to question a defendant's competence and to grant a competency hearing under an abuse of discretion standard.  *United States v. Ross*, ___ F.3d ___ ,2012 WL 6734087 (6th Cir. 2012) (citing *United States v. Jones*, 495 F.3d 274, 277 (6th Cir. 2007)).  A defendant's competence is a question of fact, which this Court reviews for clear error.  *United States v. McCarty,* 628 F.3d 284, 294 n. 1 (6th Cir. 2010); *see also United States v. Willis*, 362 Fed. Appx. 531, 533 (6th Cir. 2010) (citing *Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005)).

### B.    Discussion

Suggs maintains that the district court improperly denied his request to reevaluate his competency after two prior examinations had been completed. Specifically, he argues that his previous diagnosis of depression and adjustment disorder combined with increasingly erratic behavior as the date for his trial approached warranted another competency evaluation.  A review of the record fails to support Suggs' argument.

42

"The bar for incompetency is high: a criminal defendant must lack either a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.' " *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975) (internal quotation marks omitted)). In making this determination, the district court must consider several factors, including the defendant's demeanor, any prior medical opinion regarding competency, and evidence of irrational behavior. *Miller*, 531 F.3d at 348; *Williams v. Bordenkircher*, 696 F.2d 464, 466 (6th Cir. 1983). An attorney's opinion about his client's competency is likewise a relevant factor. *United States v. Tucker*, 204 Fed. Appx. 518, 520 (6th Cir. 2006) (citing *Owens v. Sowders*, 661 F.2d 584, 586 (6th Cir. 1981)); *United States v. Jackson*, 179 Fed. Appx. 921, 933 (6th Cir. 2006).

Moreover, although a defendant may show signs of paranoia or other mental illness, "such an illness would not necessarily render [the] defendant incompetent to stand trial." *Miller*, 531 F.3d at 349 (citing *United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996)). In short, "[t]here are ... no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of

43

manifestations and subtle nuances are implicated." *Williams*, 696 F.2d at 466

(quoting *Drope*, 420 U.S. at 180).

The district court conducted a hearing on Suggs' motion to reevaluate his

mental competency on January 17, 2012.  (R. 92: Sealed Hearing Transcript,

1/17/12, PageID 539).  Suggs' psychiatrist, Dr. Olufunke Fajobi, briefly testified

but would not answer any questions about Suggs because Suggs refused to allow

it.  (*Id*., Fajobi, PageID 543).  Suggs did allow the district court to ask Fajobi a few

general questions.  Fajobi testified that he had not seen Suggs in the past 30 days

but he did see him on a regular basis.  (*Id*., PageID 546).

Colleen Smith, a licensed clinical counselor, testified that she had been

seeing Suggs as part of his pretrial services since October, 2010.  (*Id*., Smith,

PageID 550).  Smith stated that Suggs consistently attended his appointments and

willingly participated in the counseling sessions.  She testified further that he had

not given her any indication that he was delusional or experiencing hallucinations

of any kind.  (*Id*., PageID 557).  Smith did state that Suggs was experiencing

anxiety about his upcoming trial but had not noticed any signs of diminished

capacity in the two months preceding the hearing.  (*Id*., PageID 557-59).  Smith

also stated that she believed Suggs understood the proceedings against him and

was able to assist in his own defense.  (*Id*., PageID 564).

44

Suggs's pretrial services probation officer Kara Cabanes also testified that,
within the last two months, she did not see Suggs act in unusual, bizarre or
disconcerting manner.  (*Id*., Cabanes, PageID 567).  She also believed Suggs was
able to understand the charges against him and assist in his defense.  (*Id*., PageID
570).

At the conclusion of the hearing, the district court decided that another
competency evaluation was unnecessary.  Specifically, the court noted:

> This Court has reviewed all the medical records that have been
> referenced, and we can go back to the competency evaluation of
> September 24th, 2010.
>
> The other competency evaluation of May 16th, 2011, those are the
> only professional examinations for the purpose of determining
> competency. Those both found independently that the defendant was
> competent to stand trial.
>
> This morning my questions of the several witnesses focused on the
> recent behavior of the defendant to see if there was a change as
> alleged in the motion.
>
> The testimony, as I heard it, was unanimous and consistent that there
> has been no change in the defendant's behavior. If anything, there has
> been an improvement in defendant's behavior; that over time with the
> housing situation he has improved, he's maintaining his appointments,
> he's understanding what his medical providers are discussing with
> him, he is assisting counsel in the preparation of the trial, he's aware
> of the upcoming trial.

45

I have also been very attentive of the defendant, I want the record to reflect this, during this morning's hearing. I have been watching him. He is pleasant. He is dressed appropriately. He has answered my questions appropriately. He has been assisting his lawyer with information. He seems very much aware of who he is, where he is -- he's nodding yes as I speak -- and understands according to the testimony the gravity of the trial and the consequences of the trial.

The testimony indicates he has displayed some anxiety. Who wouldn't be anxious coming up to a trial? Whether you're a party or the Judge or a lawyer, everybody is a bit anxious when there's a trial. I find that a perfectly normal reaction.

It is incumbent upon the defendant to indicate and to provide some basis for this Court to order a re-exam. And by the way, I have taken into account the treating doctors' laundry list of diagnoses and also taken into account the Social Security application of some time ago, and I'm weighing that as well, but I would note that incompetency to stand trial is not defined in terms of mental illness.

Cases have found a defendant competent to stand trial despite some mental illness, and I would also note that I am required, and I have taken into account the medical evidence before me. And as I say, there's nothing that I see in that medical evidence which would suggest that a re-exam, in other words a third one, would be appropriate at this point in time.

I've indicated that I have observed the defendant's attentiveness here in court and the attentiveness he has given to the case based on the testimony we have heard today. That's also a factor which is appropriate for me to take into account.

I've asked and received an indication from several witnesses today that he certainly appears competent to stand trial in the sense that he's able to understand the proceedings that are against him and has been able to assist his counsel in his defense, and that without any evidence to support a finding of reasonable cause to believe that he is

46

> incompetent, I am not required to order yet a third exam.  And I
> believe it not appropriate for me to order a third exam.

(*Id.*, PageID 581-84).

Based upon the foregoing, the district court did not abuse its discretion by denying Suggs' request to reevaluate his competency.  As the district court noted, Suggs had been evaluated before by two separate doctors, once in September, 2010, and again in May, 2011.  Suggs was found to be competent on both occasions.  (R. 80: Memorandum Opinion and Order, PageID 469).  In fact, one doctor opined that Suggs may have overstated his mental illness to delay or influence the outcome of his case.  (*Id.*).

In addition, none of the witnesses who testified at the hearing opined that Suggs was not competent to stand trial.  Smith concluded that Suggs' mental health had actually improved since she began seeing him and Cabanes believed Suggs was fully aware of the charges against him and was able to assist in his defense.  Neither witness thought Suggs was delusional in any way.  The district court also noted that it had carefully observed Suggs throughout the hearing and, although he may have shown anxiety about his pending trial, he acted in an appropriate manner at all times during the hearing and assisted in the presentation of his position.  (R. 92: Sealed Hearing Transcript, 1/17/12, PageID 582).

47

Moreover, the fact that Suggs may have expressed suicidal thoughts after he was convicted and awaiting sentencing does not alter the district court's conclusion that he was competent at the time of trial.  At a bond revocation hearing on February 9, 2012, Colleen Smith testified that Suggs had discussed the idea of suicide because of his conviction.  (R. 134: Bond Revocation Hearing, Smith, PageID 1933).  Later, in a conversation with his probation officer, Suggs claimed that he had been joking when making those comments.  (*Id*., Cabanes, PageID 1945).

After hearing the testimony, the district court and the parties agreed that Suggs' bond should not be revoked as long as he signed an anti-suicide pact with Colleen Smith, saw his psychiatrist Dr. Fajobi once a month and agreed to allow Smith to speak with Dr. Fajobi.  Suggs agreed to all three conditions.  (*Id*., Smith, PageID 1947).  Clearly, even considering Suggs' possible suicidal thoughts, which Suggs denied, neither the district court, the parties nor pretrial services believed he was incompetent.  It is reasonable to assume that if they believed Suggs had become incompetent, his bond would have been revoked.

Ultimately, as the district court properly noted:

"[T]he denial of a psychiatric evaluation [is] not an abuse of discretion and not a violation of the defendant's due process rights where a previous psychiatric evaluation was on record for the

48

defendant, and the court had the opportunity to draw its own conclusions based on its observations of the defendant." *United States v. Redditt*, 87 Fed. Appx 440, 448 (6th Cir. 2003) (refusal to grant second psychiatric examination was not a violation of due process) (citing *Mackey v. Dutton*, 217 F.3d 399, 414 (6th Cir. 2000).

(R. 80: Memorandum Opinion and Order, PageID 468).

Here, the court relied upon previous competency evaluations, witness testimony of those who had observed and interacted with Suggs on a regular basis and its own observations in concluding that a competency reevaluation was unnecessary. The record supports the court's conclusion and there is no basis for upsetting that determination. *Willis*, 362 Fed. Appx. at 535 (citing *Wolcott v. United States*, 407 F.2d 1149 (10th Cir. 1969)).

Suggs is not entitled to relief on this claim.

49

## CONCLUSION

Based upon the foregoing, the United States respectfully requests that this

Court affirm Suggs's convictions.

Respectfully submitted,

STEVEN M. DETTELBACH
United States Attorney


By:  /s/ *Daniel R. Ranke*
Daniel R. Ranke
Assistant U.S. Attorney
United States Court House
801 West Superior Avenue
Suite 400
Cleveland, Ohio 44113
Telephone No: (216) 622-3753
Facsimile No: (216) 522-7358

50

## **CERTIFICATION OF COMPLIANCE WITH WORD LIMITATION**

I hereby certify that the foregoing contains 9,369 words according to the word count feature of WordPerfect X5 and complies with this Court's 14,000 word limitation for briefs.

/s/ *Daniel R. Ranke*
Daniel R. Ranke
Assistant U.S. Attorney

51

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing plaintiff-appellant brief was filed electronically on this 14th day of January, 2013.  Service upon counsel of record will be made through the Court's electronic filing system.

/s/ *Daniel R. Ranke*

Daniel R. Ranke
Assistant U.S. Attorney

52

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 30(b), the following filings from the district

court's records are designated as relevant to this appeal:

| DESCRIPTION OF ENTRY | RECORD ENTRY NO. | PAGE ID RANGE |
|---|---|---|
| Docket Sheet, Northern District of Ohio, Case No. 1:09CR229 | N/A | N/A |
| Indictment | 1 | 1 |
| Government's Motion to Dismiss | 73 | 351 |
| Suggs' Sealed Motion | 74 | 357 |
| Suggs' Motion to Continue | 75 | 359 |
| Suggs' Motion in Limine | 79 | 464 |
| Memorandum Opinion and Order | 80 | 468 |
| Jury Verdict | 81 | 471 |
| Sealed Competency Transcript, 1/17/12 | 92 | 539 |
| Judgment | 116 | 1045 |
| Notice of Appeal | 118 | 1055 |
| Trial Transcript, 1/18/12 | 131 | 1274 |
| Trial Transcript, 1/19/12 | 132 | 1547 |
| Trial Transcript, 1/20/12 | 133 | 1759 |
| Bond Revocation Transcript, 2/9/12 | 134 | 1924 |
| Pre-Sentence Investigation Report | N/A | N/A |